MAURICE H. COOK vs. AMERICAN TUBING & WEBBING COMPANY.

28   41
30   299

### JUNE 15, 1906.

PRESENT:   Douglas, C. J., Dubois, Blodgett & Johnson, JJ.

(1) *Bills and Notes.   Accommodation Paper.   Notice.*

Drafts were drawn by the A. Company in Providence upon B. & Company in New York, payable to the order of   and endorsed by the drawer and accepted by the drawees.   They were discounted by claimants for the acceptors.

*Held,* that as between the original parties they represented no contract whatever and were accommodation paper.

*Held,* further, that where the drafts were discounted for the acceptors the claimants were notified of the character of the paper by the fact that it was so presented and discounted.

(2) *Corporations.   Ultra Vires.   Notice.   Estoppel.*

The Commercial Company was in business lending money upon commercial accounts due at future dates, the loans being secured by assignments of the accounts.

The president and general manager of the A. Company brought to the commercial company certificates showing that B. & Company were indebted to the A. Company for goods sold and delivered and that the claim for the purchase price was assigned to the commercial company, the certificate further guaranteeing payment in full of the accounts to the commercial company.   The certificates were signed by the general manager in the name of the A. Company.

X., a member of B. & Company, further delivered to the commercial company a letter showing that the goods had been delivered to and accepted by B. & Company.

At the request of the general manager of the A. Company, the commercial company delivered the check to the order of the A. Company to Z. the counsel of the Trust Company of the Republic of which a member of B. & Company was president.   This fact was known to the Commercial Company.   This check was deposited to the account of the A. Company.   It further appeared that the proceeding was a scheme of B. & Company to raise money in which the officers of the A. Company participated; that the supposed sales had no actual existence and that B. & Company secured possession of the fund by taking from the general manager of the A. Company checks against it in advance.

By the by-laws of the A. Company the business was to be managed by the general manager under the direction of the directors, and in default of direction necessarily according to his own judgment.

In fact throughout thirteen years but two regular monthly meetings of the directors were held.

During this time the general manager was authorized to draw checks in his discretion upon any banks in which the company might have deposits, and in the absence from the city of the treasurer or in case of sickness to sign and endorse all checks and drafts made by or payable to the company.

During this time also while it had been necessary to borrow large sums for the conduct of the business no loan was considered by the directors officially, although a majority of the directors knew about every loan as they did of the loan in question from the commercial company.

*Held*, that the acquiescence of the stockholders and directors had held the president and general manager out to the public as authorized to borrow money in the name of the company; that in this case the loan was made to the company and the check was to their order and deposited to their account, and the vote authorizing the general manager to draw checks upon "any banks in which the company had deposits" by necessary implication gave him power to open accounts in more than one bank, and that the sum lent came into the possession of the company.

*Held*, further, that the fraud upon the company by its officers did not consist in borrowing money in its name, but in diverting the deposit to the hands of B. & Company.

*Held*, further, that unless the commercial company was privy to this intention it stood as a creditor in good faith for the amount of the loan.

Evidence considered and held not to establish actual or constructive notice of the fraud as against the commercial company.

(3)    *Drafts.   Accommodation Paper.   Notice.   Corporations.   Ultra Vires.*

Other drafts of the A. Company signed in its name by its treasurer, and countersigned by its president, payable to itself and endorsed in its name by its treasurer, drawn upon and accepted by B. & Company, were discounted by the Commonwealth Trust Company.

Dresser, a member of B. & Co., was president of the trust company and a member of all its committees, and by the by-laws had power to invest its funds in commercial paper in the intervals between the regular weekly meetings of its finance committee, reporting his action to the committee at its next session.   The drafts in question were some of the accommodation paper which was drawn by the officers of the A. Company and which B. & Company had on hand to be filled in with dates and amounts and negotiated.

The general manager of the A. Company at the instance of B. & Company opened an account at the Trust Company.   The drafts were discounted by the Trust Company and the proceeds placed to the credit of the account. On the day before the discount checks drawn on the Trust Company, signed by the A. Company by its general manager, and payable to the order of B. & Company, had been cashed by another bank and were paid by the Trust Company, the day of the discount.

None of the officers of the A. Company knew at the time that these discounts had been made.

It did not appear in evidence by whom the drafts were offered to the Trust Company.

*Held*, that the inference was that the drafts were offered to the Trust Company by Dresser and that Dresser was the active agent of the Trust Company

in discounting the paper, and that under the authority of the by-laws of the Trust Company the president had authority to make the loans.

*Held*, further, that the facts showed a fraudulent scheme to raise money for B. & Company on the credit of the A. Company.

*Held*, further, that the officers of the A. Company were acting in excess of their lawful power in issuing the drafts and that the knowledge which Dresser had of the character of the transaction was imputed in law to the Trust Company.

*Held*, further, that the claim of the Trust Company against the A. Company was properly rejected.

PETITION in equity to wind up the affairs of an insolvent corporation. Heard on certification from Superior Court upon exceptions to report of master.

DOUGLAS, C. J.   This case is brought by a stockholder of the defendant, an insolvent corporation, to wind up its affairs and to distribute its assets amongst its creditors. It comes before us by certification from the Superior Court, under section 338, court and practice act, having been heard for final decree in that court upon exceptions to the report of the master, who had been appointed to consider the validity of claims against the defendant corporation. These exceptions were filed by sundry parties whose claims had been disallowed. The majority of these claims may be classified together, while the claims of the Manufacturers Commercial Company and of the Commonwealth Trust Company, formerly the Trust Company of the Republic, present features which must be considered separately.

The claims included in the first class were based upon drafts drawn by the American Tubing & Webbing Company, in Providence, upon Dresser & Company, New York, payable to the order of and endorsed by the drawer and accepted by the drawees. These drafts were discounted by the various claimants for the acceptors or a member of the accepting firm. The master rejects these drafts because he finds that they constituted accommodation paper which the drawer had no legal power to issue, and that the claimants took them with notice of their character, imputed by law, from the fact that they came from the hands of the party primarily liable.

The exceptions are in many cases loosely drawn, some of

them being to the argument of the master rather than to his findings, but they raise the questions clearly enough—

First.   Whether these drafts were accommodation paper.

Secondly.   Whether such paper was valid against the drawer in the hands of a purchaser with notice of its character.

Thirdly.   Whether the claimants, respectively, had actual or presumptive notice of the character of the paper.

(1)   In considering the first question it is necessary to know the relations of the parties to this paper and the circumstances in which it was issued.   The master's statement of these circumstances does not differ essentially from those made by the counsel for the several parties, and is well supported by the evidence.

The firm of Dresser & Company was composed of D. Leroy Dresser and Charles E. Riess, and conducted a commission business in the city of New York, with an office also in Chicago, a part of this business being the marketing of a large part of the product of the American Tubing & Webbing Company, which was a Rhode Island corporation located at Providence and engaged in the manufacture of tubing and webbing.   D. Leroy Dresser owned a majority of the stock of the defendant corporation, and had been instrumental in the increase of the business of the company by effecting a consolidation with it of two other manufacturing concerns in which he had been interested.   Dresser & Company also, by an agreement with the company, financed its business and in return therefor had certain rights to commissions on goods sold direct to its own customers and exclusive control of its principal product. The financing of the webbing company by Dresser & Company. was accomplished by Dresser & Company permitting the webbing company, when in need of funds for its current uses, to draw on them; whereupon they accepted the drafts and returned them to the webbing company, who in turn secured their discount through Wheeler and Jones, note brokers, in Boston.   When the drafts accepted under this agreement were sent to the webbing company by Dresser & Company, a debit was made upon their books against the webbing company, and when the drafts were discounted by the webbing

company, Dresser & Company were given credit therefor on its books. When the drafts of this class became due, the webbing company placed Dresser & Company in funds to meet them and debited Dresser & Company with such remittances. Dresser & Company also paid by way of accepted drafts at stated periods for the merchandise sent to them by the webbing company, and likewise for certain machinery and a stock issue; and in the case of these drafts, Dresser & Company paid them at maturity, such drafts being their obligations. The account with Dresser & Company on the books of the webbing company had always been kept in the name of D. Leroy Dresser, and no distinction was made at any time between Dresser & Company and D. Leroy Dresser, and no one ever excepted to that method or claimed at any time that there was any distinction between the firm and the individual which required any separation on the books of the webbing company.

D. Leroy Dresser was the president of the webbing company until the annual meeting of the corporation in 1902, and a member of its board of directors up to the time of its failure. The executive officers at the time of the failure were Alfred Caldwell, who was president and general manager, and Grenville M. Thurlow, who was treasurer. The last named two men had a practical knowledge of, and attended to, the manufacturing end of the business of the webbing company, but submitted themselves to D. Leroy Dresser for advice and direction in regard to the finances of the corporation, considering that they were compelled thereto by reason of Mr. Dresser's supposedly greater familiarity with such matters and by the pressure of his predominance in the control of the corporation by which they were employed.

In addition to the drafts used for the benefit of the webbing company, whether under agreement of Dresser & Company to finance the webbing company or by way of payment for goods, machinery, and stock issue, there were a large number of drafts used exclusively for the benefit of Dresser & Company, as follows: Dresser & Company, or Mr. Dresser, being interested in large and sometimes speculative enterprises in New York,

were often in need of money, and to secure such amounts as were needed Caldwell and Thurlow were requested to send drafts to Dresser & Company for their acceptance and use. Caldwell and Thurlow, while recognizing fully that there was no legal obligation on their part requiring them to accede to such requests, still felt obliged to do so, for the reason that, as Caldwell says, he was getting his living out of the corporation and felt that he could rely on Mr. Dresser, and, as he implies, because he did not wish to cross him by a refusal.

These drafts were sent to Dresser & Company, generally, in blank as to amount, were in the same form as the genuine obligations of the webbing company, were never entered on the books of the webbing company, were never carried on the books of Dresser & Company, other than on the bills payable book, and were never placed to the credit of the webbing company on any books of Dresser & Company. All parties, therefore, apparently concurred in treating them as transactions outside of the regular course of business. These drafts were discounted on presentation by Dresser & Company, the acceptors, and they received the proceeds of the discount, except in the case of the American Exchange National Bank, which on the face of the paper discounted the drafts for the benefit of D. Leroy Dresser, but the proceeds were checked out to Dresser & Company, the acceptors. Upon the failure of Dresser & Company, and the webbing company, a large number of these drafts were outstanding, not having matured, and it is upon these drafts that the claims now under consideration are based.

Upon these facts we must agree with the master that the drafts were accommodation paper. It is certain that, as between the original parties, they represented no contract whatever. In form they were promises by Dresser & Company to pay money to the webbing company, or its order, which the webbing company could not have enforced. Nor, if Dresser & Company had paid the drafts at the request of the webbing company to some subsequent holder, could they have charged such payment to the webbing company's account. The paper first came into life as representing a real

contract when it was discounted; as between the original parties it was without consideration.

It is urged that there was a valuable consideration for these drafts in the class of drafts first mentioned, which were of similar tenor and were discounted in Boston for the webbing company. Those were likewise accommodation paper in the strict sense of the word, for they represented no contract between the original parties, the acceptance in one case being without consideration as the making and endorsement were in the other. It does not appear, however, that these two classes of drafts had any relation to each other in amount or date of issue or in the contemplation or intention of the parties. The first class were accepted by the firm in pursuance of its obligation to provide funds for the use of the corporation, and the second class constituted a plain loan of the credit of the corporation to the firm to enable the latter to procure funds for any of its numerous undertakings.

The argument of the claimants hardly denies that the drafts we are considering were accommodation paper, but urges most strenuously that it was such accommodation paper as the defendant corporation in the circumstances might lawfully make, and we pass therefore to consider the second question.

The power to issue accommodation paper is generally in excess of the powers of corporations and therefore void as *ultra vires*, in the true sense of the term. *Tod* v. *Kentucky Union Land Co.*, 57 Fed. Rep. 47, 51. "This proposition," says Judge Lurton, "rests upon two or more very evident reasons:

"(1)  The corporate funds belong to its shareholders, and, by the very terms of the law creating it, can not be devoted to any other purpose than those indicated by its charter and constitution. Such obligations would violate the fundamental terms of the agreement between the corporators themselves.

"(2)  To do so would be to exercise a power not conferred by the State either expressly or impliedly. The State's grant of the corporate franchises is for the purpose prescribed, and the execution of such obligations would be beyond the power

conferred, and therefore a diversion of the corporate purposes, as well as of the corporate funds.

"(3) Such obligations rest upon no consideration, and would not, therefore, be valid. They would amount to a donation of the corporate funds, and therefore an unlawful diversion. Mor. Priv. Corp. 423; *Davis* v. *Railroad Co.* 131 Mass. 258; *Madison Plank-Road Co.* v. *Watertown Plank-Road Co.*, 7 Wis. 59; *McLellan* v. *File Works*, 56 Mich. 579 (23 N. W Rep. 321); *National Park Bank* v. *German-American Mutual Warehouse & Security Co.*, 116 N. Y. 292, 22 N. E. Rep. 567; *Ætna Nat. Bank* v. *Charter Oak Life Ins. Co.*, 50 Conn. 167."

To these authorities may be added 3 Cook on Corp. 5th ed. §§ 761, 774; 1 A. & E. Ency. Law, 2nd ed. 346; 7 A. & E. Ency. Law, 2nd ed. 793; Clark & Marshall on Priv. Corp. § 182, p. 479; *Steiner* v. *Steiner Land Co.*, 120 Ala. 128, 139, 144, and cases cited.

Counsel for the claimants do not deny the general principle that a corporation without special authority can not issue accommodation paper. They even quote with approbation from Clark & Marshall on Private Corporations:

"Sec. 182. It is well settled that a corporation has no implied power to issue or indorse bills or notes in which it has no interest for the mere accommodation of another, for such a transaction is ordinarily foreign to the objects for which corporations are created; and it can make no difference that the corporation will be incidentally benefited by such a transaction, or is paid a consideration, or that the transaction is consented to or ratified by all the stockholders," &c.

But they dwell with great emphasis upon the proposition that corporations whose normal business it is to make loans may lend credit when that is equivalent to lending money, and invoke the somewhat indefinite doctrine that the test of the validity of corporate action must be sought for in the surrounding circumstances, not in general rules of law; that in effect the morality of corporations is opportunism, pure and simple. The idea has been long ago embodied in the maxim *salus reipublicæ suprema lex* — a doctrine which should be very sparingly resorted to by a State which has a written constitu-

tion or a business corporation created by a written charter. Some of the more recent developments of the idea have met public disapproval in the diversion of life insurance assets for the supposed and probable benefit of the company by the purchase of the good-will of political managers.   If usefulness to the corporation were the only criterion to apply to the question of legality of the employment of its funds, we should have less hesitancy in approving the. subsidizing by these insurance companies of powerful agencies for good or harm in legislation than in justifying the action of the officers of this corporation in lending its credit to the principal stockholder.

A corporation is an artificial creature.   It has just those powers, express and implied, which its creator gives it, and no more.   When the charter limits the scope of its business, no exigency will permit it to engage in another kind.   A manufacturing company can not become a bank because it may consider banking more profitable than spinning cotton.

There are certain things which any certain corporation may lawfully do, and other certain things which it may not lawfully do; and between these lines there is a broad category of acts which may be appropriate and lawful if demanded by the circumstances, and unauthorized and void if not necessary for the support of the corporation's legitimate business.   It is to this category that Mr. Morawetz refers when he says (§ 362): "No rules can be framed which would be of any practicable value in determining cases of this character. . . . The application of the law to individual cases must always remain a matter involving the exercise of sound, practical judgment and business experience.   Great caution is therefore necessary in treating a decision that a corporation has or has not authority to do a particular act as a precedent to be followed in other cases."

The illustrations cited by the counsel to this doctrine are very remotely analogous to the present case.

In *Tod* v. *Kentucky Union Land Co.*, a land company was authorized to acquire and consolidate with a railroad, and it

was held that in doing so it might guarantee the bonds of the railroad company.

In *Stark Bank* v. *U. S. Pottery Co.*, 34 Vt. 144, the question of urgent necessity it is said should have been left to the jury.

In *Blake* v. *Domestic Sewing Machine Co.*, 38 Atl. Rep. 241 (N. J.), a manufacturing company and a selling company were so intimately engaged in business that the court say (p. 260): "The business of the manufacture and sale of sewing machines was, in point of fact, carried on by the two companies as one entire business, in which both companies were dependent for their continuance upon the realization," &c. . . . "The companies, although nominally separating the business into that of manufacturing and selling, each acted to a certain extent as agent for the other, and by reason of the course of business pursued by both during the entire period the connection was so close and complicated that it was found impracticable to settle or adjust accounts between them," &c. The court's conclusions are: "First, that the manufacturing company actually received the proceeds of the discounts to a large extent, and that as to the balance of the proceeds of discount, which seem to have gone ultimately to the credit of the sewing-machine company, the paper was not, in view of the relation between the companies, and on the whole circumstances of the case, accommodation paper."

The *dictum* quoted from *Holmes, Booth & Haydens* v. *Willard*, 125 N. Y. 75, supposes a different state of facts from the one before us.

The case of *Hess* v. *Sloane*, 66 App. Div. N. Y. 522, seems to us to go dangerously near an adoption of the doctrine we have criticised above. If, as there held, a corporation may guarantee against loss the endorser of its debtor when it seems expedient to do so, we can conceive of no restriction upon the use by a board of directors of a stockholder's money, paid in under certain restrictions defined by charter, closer than the requirement that the board shall believe the use to be beneficial; but in this case the court say (p. 525): "Whether such a corporation would have power to indorse a note or loan its credit for the accommodation of another with whom it has no

business transactions or *where such an accommodation has no relation to the business that it was organized to transact is not presented.*"

But the evidence in the case at bar shows most conclusively that the loan of credit by the webbing company to Dresser & Company had no relation to the business that the company was organized to transact. The firm was no more to the corporation than any selling agent would have been; neither party transacted its whole business with the other. If the firm had failed at any time within the year before its actual failure, the corporation could have stood under all its own obligations and could have easily procured a new agent to act for it in the New York market. So far as the corporation was interested, there was never any pressing necessity to keep the firm upon its feet. And that no such contingency was thought of is apparent from the testimony of the defendant's officers, Caldwell and Thurlow. Neither of these witnesses can be induced to say that any motive connected with the prosperity of the webbing company actuated these loans of credit. The paper was made and endorsed solely because D. Leroy Dresser ordered the officers of the corporation to make and endorse it, and was given to his firm for discount because he needed the money for his own speculations.

It is idle to urge that the principle of indefinite implied powers to be exerted in cases of exigency can have any application to this case.

We find nothing, therefore, in this paper to place it amongst the exceptions to the general rule.

We find no error in the master's conclusion that in those cases where the drafts were discounted for the acceptors, comprising all this accommodation paper except that held by the American Exchange Bank, the claimants were notified of the character of the paper by the fact that it was so presented and discounted. The principle of law which he applies, that "Where the party primarily liable on a draft or note presents the same for discount with the name of the drawer or endorser thereon the transaction on its face shows that the drawer or endorser is a mere accommodation party and the bank or person

receiving such paper is chargeable with notice of the accommodation character of the paper," is sustained by the cases he cites as well as by the general agreement of authority. *Powell* v. *Waters*, 8 Cowen (N. Y.), 669, 688, 689; *Brown* v. *Taber*, 5 Wendell (N. Y.), 566; *Stall* v. *Catskill Bank*, 18 Wendell (N. Y.), 466; *Feilden* v. *Lahens*, 2 Abb. (N. Y.) 111; *Nat'l Park Bank* v. *German-American Warehousing, &c., Co.*, 116 N. Y. 281; *Nat'l Park Bank* v. *Remsen*, 43 Fed. Rep. 226, 227; *Park Bank* v. *Remsen*, 158 U. S. 337, 343; *Smith* v. *Weston*, 159 N. Y. 194, 200; *Oppenheim* v. *Simon Reigel Cigar Co.*, 90 N. Y. S. 355; *Manhattan Web. Co.* v. *Aquidneck National Bank*, 133 Fed. Rep. 76, 77; *Brill* v. *Norton & T. Street Ry. Co.*, 75 N. E. Rep. 1090.

We are unable to follow the reasoning of the brief for the claimants on this point. It appears first to deny that the circumstances constituted notice; then to admit that they did, but to insist that the paper was not in fact accommodation paper; then to urge that this was a case where the corporation had received a benefit, and therefore is estopped to set up the defence of *ultra vires;* and, inasmuch as a consideration for a contract may sometimes be a disadvantage suffered, as well as a benefit conferred, so here it makes no difference to the estoppel that the corporation never received any advantage from the discount of this paper so long as the claimants parted with value for it to somebody else.

When the argument continues by insisting that notice of a fact is not proof of the fact, and therefore what the law calls notice is not notice if the fact be otherwise, it is difficult to see how it controverts the proposition that notice in well-established form throws upon the person receiving it the risk of the existence of the fact notified; so that when we have, as here, the fact of accommodation and the circumstances which tell of accommodation, the claimants who discount paper as these claimants did take just what the form of the transaction notified them that they were taking, namely, commercial paper void as against a corporation drawer and endorser. The argument is incoherent and often, as is pointed out by the counsel for the receivers, lapses into a mere juggling with words.

Equally unconvincing is the attempt to prove a custom, in the city of New York, to disregard the notice of the defective character of the paper which the courts have said the offering for discount by the acceptor furnishes.

The authorities agree that these circumstances constitute notice. The testimony shows that sometimes the notice is misleading, or that it is often disregarded. In this case the notice was disregarded, it is true, but it was not misleading. If the claimants shut their eyes to the *indicia* before them, in the blind confidence that the paper would turn out to be trade paper, they have none the less had their warning and can not plead good faith and lack of notice. In the cases cited by the claimants the notice was claimed upon circumstances which the courts held it was incumbent upon the purchasers of the paper to look for; while here the warning came from the face of the paper itself and the acts of discount in which the claimants participated. The contention that this paper ought to be held valid because it was issued with the approval of holders of a majority of the stock would abrogate the rights of minority stockholders and of creditors who have made advances upon the faith that the charter and general laws would direct the management of the corporate affairs.

The Supreme Judicial Court of Massachusetts say, in a recent case: "It is settled by *Usher* v. *Raymond Skate Co.*, 163 Mass. 1, and the cases there cited, that a corporation is not liable on an accommodation indorsement in the hands of one who takes with knowledge of that fact. Such an indorsement is *ultra vires*. That means that the corporation would not be liable on it, even if it had been authorized by all the directors and a majority of the stockholders." *Brill* v. *Norton, &c., Ry.Co.*, *supra*, p. 1093.

It seems to us that this argument can hardly be offered seriously, in the face of the authorities.

The drafts held by the American Exchange National Bank differ from the others in that they were not endorsed by Dresser & Company, but by D. Leroy Dresser, and the proceeds of discount were carried to his individual account of deposits,

which he had kept for some two years with the bank. The claimant therefore had not the same notice from the form of the paper that it was drawn for the accommodation of Dresser & Company, the acceptors. It is in evidence, however, that the bank had a general knowledge of the relations and course of business between the webbing company and Dresser & Company, or D. Leroy Dresser, and that Mr. Clark, who managed their discounts, was told by Dresser that the paper was offered on account of the firm.

Dresser's evidence is, "Q.103. State the substance, as you recollect it, of your conversation with Mr. Clark? A. In offering the paper I took it down personally and offered it to him, and in a general way went over the situation—that the American Tubing & Webbing Company owed us some money and that these acceptances were against that account. That is all I can recollect of the conversation."

The proceeds of the drafts were drawn out on checks in favor of the firm within a few days.

We find here, as argued by the counsel for the receivers, sufficient proof, in the absence of any definite explanation of the transaction on the part of the bank, that the fact was known to the bank that the discount was for the benefit of Dresser & Company, although the form of the entries in the books indicated that Mr. Dresser individually was the holder of the paper. Under the provisions of the Neg. Inst. Law, the *prima facie* validity of the holder's title ceases when the fraudulent character of the paper is shown, and the burden is then thrown upon the holder to exonerate himself from complicity in the fraud. Neg. Inst. Act. N. Y. § 98; R. I. § 67; See also Crawford's Annotated Edition, note to this section, and 1 Daniel, Negotiable Instruments, 5th ed. § 815, and cases cited. A very similar state of facts led to the same conclusion in *Lemoine, Assignee,* v. *Bank of North America,* 3 Dillon, 44. See also *West St. Louis Sav. Bank* v. *Shawnee County Bank,* 95 U. S. 557, 558.

The finding of the master with respect to this class of claimants must be confirmed and their exceptions overruled.

(2)    The Manufacturers Commercial Company have presented a

claim for $50,000, alleged to have been lent to the American Tubing & Webbing Company upon the security of an assignment of certain accounts of the webbing company against Dresser & Company, amounting to about $72,000, with the guaranty by the webbing company that Dresser & Company would pay said accounts when due. These accounts were fabricated, and the money, though deposited to the credit of the webbing company, in the Trust Company of the Republic, was immediately drawn out on checks made by Caldwell, its general manager, to the order of Dresser & Company. The books of the webbing company, other than the check book, do not show any trace of the transaction. The receivers objected to the allowance of the claim, and it was rejected by the master; whereupon the claimant duly excepted, and the question of the validity of the claim is presented.

A repetition of the following facts, which are shown by the evidence, mostly undisputed, is necessary to an understanding of the questions at issue: The commercial company, a New Jersey corporation, organized in 1891, had its principal business office at 320 Broadway, New York City. Its business was lending money upon commercial accounts due at future dates. Such loans were secured by assignments of the accounts, which the company collected when due. Out of the proceeds it deducted a commission and the loan and interest, and paid over the balance to the customer.

In the conduct of its business the company usually entered into a formal sealed contract with a manufacturer which bound it to take the collection of all his accounts with his customers and to make advances upon them to a certain percentage of their face value, and after deducting advances, interest, and commissions, to account for the balance of moneys collected; and which bound the manufacturer, amongst other things, to assign all his accounts for goods sold, to pay commissions and interest, to turn over all payments which he might receive on these accounts, to furnish the company duplicate invoices of goods sold and railroad receipts, bills of lading, or other satisfactory evidence of the actual shipment of the goods mentioned in the accounts advanced upon.

In each transaction under such a contract the parties employed a form having a border in green ink, called in the evidence the "green certificate," which began by certifying that the customer "was indebted" to the manufacturer "for goods as stated below," giving the terms of the credit; then recited the invoice, and concluded by a formal assignment of the account and a certificate that the account so assigned was "a *bona fide* sale and a correct account for goods actually sold, delivered, and accepted." To this was added a guaranty of payment unless the company assumed to guarantee the account, in which case the rate of commission was increased.

Accompanying this green certificate was the original bill, or invoice, and a duplicate of the same. The company were accustomed to raise money for its business by assigning such green certificate to a bank, with one copy of the invoice, and to send the other to the customer with notice stamped upon it that payment should be made only to such bank.

The officer in charge of the company's Broadway office was Robeson Lea Low, who was secretary of the company, a director, and the head of the company's credit department. On January 8, 1903, Mr. Low was called by telephone by Charles S. Mackenzie, whom he knew as counsel for the Trust Company of the Republic, of which D. Leroy Dresser was president. Mackenzie told Low that he knew of some persons who might wish their sales cashed by the company, and Low replied that the company would consider the matter. In the afternoon Mackenzie called and said that the webbing company was the party he had referred to and that they wished their sales to Dresser & Company to be cashed, and was told again that the company would consider the matter. The next morning, January 9, 1903, Mackenzie returned with Alfred Caldwell, president and general manager of the webbing company, and introduced him to Low, who explained to him the methods of the business and gave him a number of blank green certificates. Later in the day Caldwell came again, with Charles E. Riess, Dresser's partner, bringing with him six of these "certificates" so filled out as to certify that Dresser & Company were indebted to the webbing company in sums

aggregating about seventy-two thousand dollars for goods, the details of which were given on the certificates, sold and delivered by the webbing company to Dresser & Company, and that the claim for the purchase price thereof was thereby assigned to the commercial company.   At the end of the certificate Low then stamped with a rubber stamp "we also guarantee payment in full of the above account."   Caldwell then signed each of said certificates at the end of the form of the assignment, and after the words "we also guarantee payment in full of the above account," as follows: "American Tubing & Webbing Co. Alfred Caldwell, General Manager."   Prior to the signing of the certificates it had been stated that the amount of the loan to be made by the commercial company would be fifty thousand dollars.   After the execution of the certificates Caldwell and Riess went away, leaving them and invoices of the goods they described with Low.   Either during that interview or by mail the next day, Riess, in accordance with a request from Low, delivered to Low a letter reading as follows:

"January 9, 1903.
" Manufacturers Commercial Company,
320 *Broadway, City.*
" Gentlemen:—We desire to advise you that the goods called for upon invoices numbers one to six inclusive, and dated January 9, have been delivered by the American Tube & Webbing Company to us and we accept said delivery.
" Yours very truly,
Dresser & Co."

On the next day, Saturday, January 10, 1903, Caldwell called at the office of the commercial company, and upon being told the check was not ready, requested that it be delivered, when ready, to Mackenzie.   Upon the following Monday, January 12, 1903, a check of the commercial company for fifty thousand dollars ($50,000) to the order of the webbing company was delivered by an officer of the commercial company to Mackenzie.   This check was on the same day endorsed "Pay Trust Company of the Republic or order American

Tubing & Webbing Company" and deposited in an account of the webbing company with the Trust Company of the Republic. The next day it was presented at the Merchants Trust Company for payment and paid, and the amount thereof charged against the account of the commercial company with the Merchants Trust Company.

On or about March 9, 1903, and before any of the alleged sales accounts referred to in said green certificates had fallen due, a petition in involuntary bankruptcy was filed against Dresser & Company and temporary receivers appointed of their estate. A few days later temporary receivers of the webbing company, who were afterwards made permanent receivers, were appointed in this suit. On or about July, 1903, Dresser & Company were adjudicated bankrupts, and later a trustee in bankruptcy was elected and took charge of the estate.

Neither the whole nor any part of said fifty thousand dollars ($50,000) has been paid to the commercial company by the webbing company or any one upon its behalf.

At the hearing before the master it further appeared that this whole proceeding in the name of the webbing company was a scheme invented by Dresser to raise money for himself, in which Riess, Caldwell, and Thurlow were his tools and accomplices. It is certain that these men all knew that the supposed sales of goods and accounts referred to in the certificates had no actual existence, and it was not intended that the webbing company should obtain any benefit from the money. Dresser had contrived that he should get possession of the fund by the creation of the deposit account at the trust company and by taking from Caldwell checks against it in advance. Riess and Caldwell together made out the false invoices and certificates, and Caldwell drew two checks on the account in favor of Dresser before he left New York. When he returned to Providence, Caldwell gave Thurlow a full explanation of the scheme before the $50,000 check was deposited and in time to have stopped the cheat if he had desired to do so; and a few days afterwards, when the check book was received from New York, Caldwell, with Thurlow's

acquiescence and approval, signed more checks against the account and sent them to Dresser.

In the course of the negotiations, Low, the claimant's secretary, inquired if all the goods mentioned in the certificates had been shipped, and was told by Caldwell that some of them had been sent to Chicago and some to New York and some were in the Webbing Company's warehouse, but that the latter had been set apart and were held subject to Dresser & Company's order. In view of this statement Low asked if Dresser & Company would acknowledge the delivery to them of all the goods, and upon Riess's consent to do so dictated the certificate which Riess signed in the name of Dresser & Company, *supra.*

The receivers objected to this claim that this transaction did not constitute a loan to the webbing company, that the webbing company did not receive the $50,000 and is not liable as guarantor of the account or for money received.

The master bases his rejection of the claim on his finding that Caldwell had no express or implied authority to make the loan, and that the circumstances surrounding the transaction were such as to charge the officers of the Manufacturers Commercial Company with knowledge of its fraudulent character. After a very careful examination of the voluminous evidence bearing upon these questions, we are forced to decide that the master is in error in his conclusion and in the findings upon which it is based.

It can hardly be necessary to say that we do not mean by this statement that Caldwell had the right or legal power to borrow money in the name of the webbing company and to turn it over to Dresser & Company without acknowledgment from them or charge to them upon the company's books; nor that he had the legal right to concoct false invoices to further the scheme by which he obtained the money for Dresser's use; but of Caldwell's actual authority (at least in concurrence with Dresser and Thurlow) to borrow money for the webbing company there can be no doubt, if implied authority can ever be conferred upon an officer of a corporation by uniform and long-continued sufferance of its directors.

The citations from the by-laws and records of the webbing company made by counsel for the claimant are overwhelming. The by-laws, so far as they bear on this case, are as follows:

## "Article 1.

### "Business.

"Its business shall be managed by a Board of Directors, acting through a President, Treasurer, General Manager, and such other agents as they may appoint."

.    .    .    .    .    .    .    .    .    .

## "Article V.

### "directors.

"At each annual meeting there shall be chosen from among the stockholders three Directors."    .    .    .

Before these transactions the number was increased to five.

## "Article VI.

### "meetings of the directors.

"The regular meetings of the directors shall be held at the office of the company, on the first Monday of each month at such hour as the Board of Directors shall by vote provide.

"Special meetings may be held at any time upon the call of the President or two Directors, notice of which shall be given to each Director by the President or Secretary, by mailing a written or printed notice to his post-office address, as recorded on the books of the company, at least three days prior to such meeting.

"Two Directors shall constitute a quorum for the transaction of business."

## "Article VII.

### "powers and duties of directors.

"The Directors shall annually elect from their own number a President, Secretary and Treasurer, and a General Manager, who shall hold office for one year, and until their successors are elected or have accepted such election, all vacancies in such offices, whenever occurring, shall be filled by the Board of Directors.

"They shall fix all salaries and require from any officer, agent, or servant such bonds as they shall see fit.

"They shall have the general oversight and control of all the property, business, and concerns of the company.

"They shall designate the device for a corporate seal.

"They shall determine the form of certificates of stock and of transfer thereof and declare all dividends.

"They may make rules for their own government and change the same at their pleasure, and generally they may do any and every lawful act which they may deem proper to carry into effect the powers of the corporation.

"They shall keep a record of their proceedings, shall examine the books of the company as often as they deem necessary."

### "Article VIII.

#### "the president.

"The President shall preside at all meetings of the stockholders and of the Board of Directors.

### "Article IX.

#### "the secretary.

"It shall be the duty of the Secretary to give notice of all meetings of the stockholders and of the Board of Directors, to attend such meetings, and to keep a record of all their votes and proceedings.

"In his absence a Secretary *pro tempore* shall be chosen."

### "ARTICLE X.

#### "the treasurer.

"The Treasurer shall have the custody of the corporate Seal.

"He shall have the custody of the funds of the company, and of all papers and documents owned by the company or under its charge.

"He shall disburse its moneys, under the direction of the General Manager or Board of Directors.

"He shall countersign all certificates of stock and sign or endorse checks, notes, drafts, orders for money, and receipts,

and such other instruments in the name of the company, as he shall be authorized by the Board of Directors. All notes or drafts made by the Treasurer shall be countersigned by the President or General Manager.

"He shall at the annual meeting, or whenever requested by the President or Board of Directors, present a full statement of the financial affairs of the company."

### "ARTICLE XI.

#### "THE GENERAL MANAGER.

"The General Manager shall have full charge and management of all the details of the company's business, subject to the President and Board of Directors.

"He shall hire and discharge all employees and assign all their duties. He shall contract for all work and materials; he shall inspect and approve all bills before the same shall be paid by the Treasurer unless otherwise ordered by vote of the Directors.

"He shall make a report of the general condition of the affairs of the company to each annual meeting of the stockholders, and whenever he shall be thereto required by the President or Board of Directors.

"He shall cause to be kept accurate books of account of business of the company which shall at all times be open to the inspection of the Directors."

The plain implication of the by-laws is that the business of the company shall be controlled and managed by the general manager under the direction of the board of directors, and in the default of direction, necessarily, according to his own judgment. How far the board of directors controlled the actions of the general manager is shown by the record of their meetings of which the following is a fair summary:

Throughout the entire thirteen years, less about one month of the corporation's existence, instead of the one hundred fifty-six regular meetings of the board of directors which should have been held during that period according to the by-laws, there were held only twenty-eight directors' meetings of any character, of which only two were regular monthly meetings.

Of these twenty-eight one was the original organization meeting of the board, and thirteen others were the subsequent annual organization meetings at which no business was ever transacted except the election of officers, the fixing of their salaries, in two instances, namely: January 15, 1894, and February 23, 1903, the voting of a dividend, and in 1896 the passing of the following important resolution:

"*Voted*, That the general manager be authorized in his discretion to draw checks upon any banks in which this company may have deposits."

Of the remaining fourteen meetings twelve were special meetings, at five of which the only business transacted was the declaring of a dividend; at three others of which the only business transacted was the acting upon the resignation of one or more officers of the company and the election of new officers in their stead; at one of which the only business transacted was the appointment of a custom house attorney; at one other of which the only business transacted was the confirmation of said appointment of a custom house attorney and the declaring of a dividend; at one other of which the only business transacted was authorizing an application for an amendment of the company's charter; and at the other one of which the only business transacted was authorizing an issue of stock. Only the remaining two meetings out of the entire twenty-eight meetings held were regular meetings of the board. Of these two the first was the first meeting of the board held after its original organization meeting. At this meeting the only business transacted was to receive and approve the report of the general manager of the condition of the company at the beginning of the month, the fixing of a regular hour for the monthly meetings of the board, and at an adjournment of this meeting the passing of the following resolution:

"*Voted*, That in the case of sickness or absence from the city of the Treasurer the General Manager may sign and endorse all checks and drafts made by or payable to the Company."

The only other regular meeting held during that entire thirteen years was held November 4, 1901, at which the only business transacted was that "Mr. Caldwell made statement

as to condition of affairs and how matters stood in moving the Newport and National Plants."

Now during all this time it was necessary for the conduct of the business that money should be borrowed from time to time in large sums, and large sums were borrowed accordingly; but in no single instance was any loan considered by the board of directors officially, although a majority of the board knew all about every loan, as they did of the loan now under consideration. More than $170,000 was borrowed under arrangements made by Dresser, Thurlow, and Caldwell, to the knowledge of all the stockholders, indeed, under an agreement that Dresser should finance the company, and these loans are allowed as genuine obligations of the company.

We think it is not too much to say that in this instance the acquiescence of the stockholders and directors had held the president and general manager out to the public as authorized to borrow money in the name of the corporation. It has been held that where the president and general manager of a manufacturing company has been accustomed to manage its affairs, without interference from the stockholders, for a long time, a presumption arose that he had authority to borrow money in its name, *Martin* v *N. F. P. Mfg. Co.*, 122 N. Y. 165. The court say (p. 175):

"What the bank did know was that Woodruff was president, general manager, and financial agent of the company. He was such by the general acquiescence of the stockholders. He and his daughter, Mrs. Winslow, owned the stock of the company. For twenty-five years there had been no meeting of the stockholders for the election of officers and very few meetings of the trustees, and Woodruff had managed the business as if it was his own. He bought its supplies, sold its products, and paid its debts.

"No other person was shown to have had a voice in the management of its affairs. Under such circumstances the giving of a promissory note in the name of the company for money borrowed was not only within the apparent scope of Woodruff's authority, but the long period during which without interference he was permitted to manage the company's

affairs justified the inference that it was within his actual authority. (*Martin* v. *Webb*, 110 U. S. 7.)"

The loan in this case was made to the webbing company, and the check was made to their order and deposited in the bank to their account. The vote of the board, January 28, 1896, which authorized the general manager in his discretion to draw checks upon "any banks in which this company may have deposits," by necessary implication gave the general manager power to open accounts in more than one bank, and the account in question was opened by him in pursuance of that authority. We are at a loss to imagine, therefore, how it can be contended, as against this claimant, that the sum lent did not come to the possession of the webbing company. When it was deposited to their credit it was as completely under their control, so far as appearances went, as if it had been handed in specie to the treasurer in their office. We must differ with the master, also, in his finding that the evidence is insufficient of the sending of accounts by the claimant to the webbing company. The testimony of two witnesses to the fact that such accounts were made and sent is as clear as such testimony can be expected to be when the fact to be proved is one in a series of customary acts, and is only met by the non-recollection of Caldwell, whose word is absolutely worthless when his own fancied interest is involved.

The fraud upon the webbing company perpetrated by its officers did not consist in borrowing money in its name, but in diverting this deposit to the hands of Dresser & Company. Unless, therefore, the claimant was privy to this intention, it stands a creditor in good faith of the webbing company for the amount of the loan. *Kraft* v. *The Freeman Association,* 87 N. Y. 628.

It can not successfully be contended that the claimant had any actual knowledge that the loan was for the benefit of any person except the webbing company. The application was made on behalf of the webbing company, and the occasion for it was said to be that Dresser & Company had been accustomed theretofore to anticipate the terms of their accounts, but now, needing their funds for other purposes, could not do so, and

the webbing company, being deprived of their usual payments, had need of an advance.

Every one of the witnesses concerned in the negotiation affirms or admits that this was the view of the situation presented to the officers of the commercial company. Even Caldwell concedes that the idea that the loan was really for the use of Dresser & Company was not mentioned. From what circumstances, then, could the commercial company have obtained this knowledge?

It is argued that circumstances calculated to excite suspicion are found in the character of the security offered and in certain variations in form from the usual requirements of the company in making such loans; and further, in the information which was given the claimant, that some of the goods had not been shipped from Providence. These circumstances were the failure to make a formal contract between the parties, the taking of the green certificates without the corporate seal, and the acceptance of the assurance from Dresser & Company that they had received the goods in place of bills of lading showing the shipment of them.

The omission of the corporate seal was, in our opinion, immaterial. The document required no seal to make it valid, and the omission of a seal from such papers is too common to excite remark. The form used in this transaction was such a modification of the ordinary forms of the company as the circumstances of this loan required. It was an individual advance, not one of a series of advances to be made from time to time under one agreement; hence there was no need of executing a contract which provided for a series of advances. It was not an advance to be made on goods shipped to various customers in different parts of the country, but on goods represented to have been sold and delivered to one firm who were accessible in New York City. The use of invoices in this case was merely to identify the goods to which the accounts related, not to prove the validity of the charges. The security taken was the claim upon the buyers, not the goods themselves.. If the buyers acknowledged the debt the value of the security was established on firmer ground than if it rested on the fact

of shipment attested by bills of lading, just as a certified check is better than an uncertified check attested by sight of the drawer's deposit book showing a sufficient balance to meet it.

Much was made in the argument of the statement of Caldwell that he told the claimant's secretary that not all the goods had been shipped from the mill. We have no hesitation in taking the testimony of other witnesses, outside the combination, wherever he is contradicted by them. His ideal of truthfulness is the substitution of the negative pregnant in place of the categorical falsehood; and when he assures Low that part of the goods are in Chicago and part in New York, and signs the green certificates, he does not live up to that. The information which was given the claimant was that the goods referred to in the yellow invoices and the green certificates had all been legally delivered to Dresser & Company, though some of them were stored as their goods in the mill in Providence. We find nothing extraordinary or suspicious in such a circumstance. If the goods had been set apart to await the orders of the purchaser and both parties agreed that the property in them had passed, the delivery was complete. And this statement is entirely consistent with the supposition that Dresser & Company had their original invoices or other memoranda in their New York office from which the yellow invoices could be made. If they had received the goods in question it was natural that they should have had lists of them with the prices. In short, the face of the transaction which was turned towards the claimant presented no features indicating fraud or insincerity.

We need not consider the question whether the assignment of accounts was a form of security which the general manager was authorized to make. Whether he could do so or not (and there is authority for the contention that he had such power, Waterman on Corp. § 130; *McKiernan* v. *Lenzen*, 56 Cal. 61; *Greig* v. *Riordan*, 99 Cal. 316), there was nothing in his offer to do so which was calculated to excite the suspicion that the loan was required for any purpose other than for the ordinary uses of the webbing company. Whether, if the security had been real, the claimant could hold it is not now

material. The loan was made in good faith to an officer having apparent authority to contract it, the lender had no actual or constructive notice that it was procured with fraudulent intent to appropriate the money lent, and we must consider the claim a valid one against the webbing company and its assets in the hands of the receivers.

The claimant's exceptions to the master's finding are therefore sustained.

(3)    The claim of the Commonwealth Trust Company is founded upon seven drafts, aggregating in amount the sum of $35,-978.23, signed "American Tubing & Webbing Company, G. M. Thurlow, Treasurer," and countersigned "American Tubing & Webbing Company, Alfred Caldwell, President," payable to "Ourselves" and endorsed "American Tubing & Webbing Co., G. M. Thurlow, Treasurer," drawn upon and accepted by Dresser & Co. and discounted by this claimant, the corporate name of which was then the Trust Company of the Republic. Five of these drafts, aggregating $25,470.55, were duly protested and notice of dishonor given to the drawer. Two of the drafts, the aggregate of which is $10,507.68, were not protested, nor is there any proof of notice of dishonor having been given to the drawer. At the time that all the drafts in question became due, Dresser & Company were insolvent and had been adjudged bankrupt in the District Court of the United States for the southern district of New York, and the American Tubing and Webbing Company were also insolvent and in the hands of receivers under a decree of the Supreme Court of the State of Rhode Island. The claimant also demands five per cent. upon the aggregate amount of the drafts as damages under the General Laws of Rhode Island, chapter 166, section 3.

The relations of the parties, whose names appear upon this paper, to each other and to the American Tubing & Webbing Company, as shown by the evidence taken upon this claim, have been substantially detailed in considering the former claims.

The evidence in this case shows, in addition, that D. Leroy Dresser was president of the Trust Company of the Republic

and *ex-officio* a member of all its committees, and that the by-laws of the claimant gave the president power to invest its funds in commercial paper in the intervals between the weekly meetings of its executive or finance committee, requiring him to report his action to the committee at its next session.

The drafts now under consideration were some of the accommodation paper which was drawn by Thurlow and Caldwell at Dresser's dictation, and which Dresser & Company had on hand to be filled in with dates and amounts and negotiated at their pleasure. No entry of these drafts appeared on the books of the webbing company, and no credit for the proceeds of them was given the webbing company on the books of Dresser & Company. The name of the webbing company was used by Caldwell and Thurlow at Dresser's dictation and solely for Dresser & Company's benefit.

As the master finds, and as the evidence shows, just prior to January 12, 1903, Mr. Caldwell, being in New York, at Mr. Dresser's instance, opened an account with the Trust Company of the Republic in the name of the American Tubing & Webbing Company. On January 24, 1903, four of the drafts in question, all dated January 12, 1903, were discounted by the trust company, and the net thereof passed to the credit of this account. On the day before this credit was made, the balance to the credit of the American Tubing & Webbing Company was $500. On the day before the discount of these four drafts, two checks, drawn on the Trust Company of the Republic, aggregating $15,000, signed "American Tubing & Webbing Co., Alfred Caldwell, General Manager," and payable to the order of Dresser & Co., had been cashed at the Seventh National Bank, New York, and were paid by the trust company on January 24, the day of the discount, this discount apparently having been made to pay for the cashing of said checks. On January 26th the other three drafts in question, dated January 16th, were discounted and credited in the same way. On the day of this discount, two checks signed "American Tubing & Webbing Co., Alfred Caldwell, General Manager," aggregating $10,000, and dated January 23, were paid by the Trust Company through the Manhattan Company, New York, by means of

an acceptance of the trust company, payable at the American Exchange National Bank, although it does not appear how long prior thereto the trust company had accepted the checks; but as payment was made through the New York Clearing House, it would seem that the acceptance had been made the day previous. This discount was apparently made to provide for these checks, and also for a check, signed in the same way, paid on the day following, January 27th, for $10,000, the latter check being paid through the Manhattan Company. These checks, all to order of Dresser & Co., and by them endorsed, with the discount fees on the various drafts, almost exhausted the balance to the credit of the American Tubing & Webbing Company. It will be seen, therefore, that contemporary with the discounts checks were paid which, except in one instance, were dated and cashed elsewhere, prior to the discount day.

It does not appear by whom the drafts were offered and the credits procured. The officers of the trust company who testified do not know. The officers who do know are not called as witnesses. It was not done by the president, the treasurer, or the general manager of the American Tubing & Webbing Company. Neither of the persons holding these offices knew that any such discounts had been made or credits entered, at the time that they were made and entered. The inference is irresistible that they were offered by Mr. Dresser, or under his directions. On February 4, 1903, the account was closed, and the entire amount credited from the beginning, except $95.06, had been drawn out by Dresser & Co. upon checks to their order made by Caldwell as general manager, by direction of Dresser. From January 12th until after February 4, 1903, Mr. Dresser was president and a director of the trust company. He was also a member of the committee which approved the loans, and was present at each meeting of the committee held within the dates named.

It seems to be the fact, as found by the master, that the active agent of the trust company in discounting this paper was D. Leroy Dresser alone, and that the executive committee merely approved the making of the loans after the loans had actually been made. The argument of the master on this

point is convincing. .He says: "Upon an examination of the by-laws of the Trust Company of the Republic in evidence it will be seen that under the provisions of Section 156 of the Banking Laws of the State of New York, the Trust Company had the power to loan money on real or personal securities and to purchase, invest in and sell stocks, bills of exchange, etc. By Article III, Section 1, the President (Dresser) was a member of the executive committee. (See also Article VIII, Section 1.) By Article III, Section 5, it was provided that 'In all cases where the duties of the subordinate officers and agents of the company are not specially prescribed by the by-laws or resolutions of the board, they shall obey orders and instrucions of the president.'

"By Article VIII, Section 2, it is provided that 'The Executive Committee may, in its discretion, *authorize the president generally to make investments in such securities as are authorized by the charter of the company,* and to dispose of such securities without previously consulting as to details with the committee; *but all such transactions shall be reported to the committee at its next meeting.*'

"By Section 4, the Executive Committee was to meet on Tuesday of each week, and by Section 5, the minutes of the proceedings of the Executive Committee were directed to be kept.

"In connection with these by-laws, it is important to note the record of the meetings of the Executive Committee in January, 1903, the month in which the drafts in question were presented and discounted, which record is in evidence and stipulated to be correct. At each of these meetings it is noted that Mr. Dresser was present."

The record is as follows:

"Meeting, January 7, 1903. Present Messrs. Goodrich, Belmont, Boldt, Greig and Dresser. 'The new loans made since the last meeting were examined and approved.'"

"Meeting, January 13, 1903. Present Messrs. Goodrich, Belmont, Boldt, Greig and Dresser. 'The loans of both offices from January 7th to 13th were examined and approved.'"

"Meeting, January 20, 1903. Present Messrs. Goodrich,

Boldt, Dresser and Greig. 'Resolved to omit examining the loans until next meeting.'"

"Meeting, January 27, 1903. Present Messrs. Belmont, Boldt, Dresser, Goodrich and Greig. 'Loans read and approved.'"

"It will be noted that in every case the minutes refer to past action on the part of the bank, which action is undoubtedly represented in the discount book containing a list of the loans, but there is nothing in the discount book to fix the date of the loans. By reference to the testimony of Mr. Miller, however, it will be seen that the loans were placed to the credit of the Webbing Company on January 24th and 26th, 1903," as is shown also by the trust company's ledger.

"Taking all the facts in evidence, it is plain therefore that, under the authority of the by-laws, the president made the loans in question and *afterwards* they were read and approved at a meeting of the committee, and when approved, the initials of the secretary of the committee were placed against the loans so approved, in the discount book."

As Caldwell had drawn and given to Dresser & Company checks (five-six-seven-eight) against this account, amounting together to $25,000, the balance of which on January 23d was only $500, and as checks five and six, amounting together to $15,000, were negotiated January 23d at the Seventh National Bank and the other two, amounting to $10,000, were accepted by the Trust Company of the Republic payable at the American National Bank, presumably on or before January 23d, it was necessary to provide funds immediately to meet them, and so it appears that Dresser did not wait for the meeting of the committee, which was to occur on January 27th, before exercising his power to discount these drafts.

Upon this statement of facts it can not be doubted that the making and endorsement of the drafts by Thurlow and Caldwell and the drawing of the checks to Dresser & Company's order, that they might be presented simultaneously with the discounts, was a fraudulent scheme to raise money for Dresser & Company, on the credit and name of the webbing company, to which Dresser was privy. The treasurer and president of

the webbing company were authorized to issue commercial paper and to sign checks on its funds in bank for all legitimate business of the company; but when they made these drafts they were lending the credit and when Caldwell signed the checks he was giving away the money, of their principal without consideration, and in both cases they were acting in excess of their lawful power and authority. If the trust company took these drafts knowing that the agents of the webbing company had no lawful authority to issue them in its name, and simultaneously or in anticipation paid or accepted the checks knowing that Caldwell had exceeded his authority in signing them, they must be held to have given credit to the agents, not to the principal, and their remedy is against them and Dresser & Company who accepted the drafts.

However fair the transaction may appear upon its face, if the trust company knew it to be fraudulent they can not plead the appearance for the reality.

The real question in the case, therefore, is whether the knowledge which Dresser had of the character of this transaction is imputed in law to the claimant.

The general rule can not be doubted that the knowledge which is possessed by an agent in regard to the business of his principal is imputed to the principal.

But the claimant urges that this rule does not apply—first, because the knowledge which Dresser possessed of the character of this transaction was acquired as a stockholder and director of the tubing company, not as president of the trust company; and secondly, because it was against the interest of Dresser to communicate such knowledge to the corporation.

The first exception to the rule is generally supported on the supposition that the agent may have forgotten the information previously acquired. 4 Thomp. Corp. §§ 5192, 5194, 5195, 5200. In the latter section the author says:

"§ 5200. Knowledge Acquired in a Previous Transaction, but Present in the Mind of the Agent when Acting in the Particular Transaction.—In like manner, the Supreme Court of the United States have held that the rule that notice to the agent is notice to the principal, applies not only to knowledge

acquired by the agent in the particular transaction, but to knowledge acquired by him in a prior transaction, and present in his mind at the time when he is acting as such agent, provided it be of such a character as he may communicate to his principal without a breach of professional confidence." (Citing, *The Distilled Spirits*, 11 Wall. 356.) "This seems to have been the rule finally established in England in a case in the court of Exchequer Chamber, where it was briefly held that, 'in a commercial transaction of this description, where the agent of the buyer purchases, on behalf of his principal, goods from the factor of the seller, the agent having *present to his mind*, at the time of the purchase, a knowledge that the goods he is buying are not the goods of the factor, though sold in the factor's name, the knowledge of the agent, *however acquired*, is the knowledge of the principal.'" (Citing *Dresser* v. *Norwood*, 17 C. B. (N. S.) 466. "The rule, as stated by the Supreme Court of Missouri, is that, where the fact of the agency is established, knowledge acquired by the agent, not only during the continuance of his agency, but also that possessed by him so shortly prior to his appointment as necessarily to give rise to the inference that it remained fixed in his memory when the employment began, must be deemed the knowledge of his principal."

The cases upon this rule mostly relate to notices of particular facts given to agents or corporate officers for the purpose of charging the principal; but the question here is as to facts in the knowledge of the officer respecting transactions in which he was the prominent actor and which he could not have ceased to have in mind while he was acting for the corporation.

The second exception to the rule is founded upon the presumption that an agent will rather consult his own interest than the requirements of his duty to his principal. His duty requires him to communicate to or to employ in behalf of his principal knowledge which he possesses which may affect such matters as have been placed in his hands; but when his own interest runs contrary to the interest of the principal it must be presumed that he will not perform that duty. This prin-

ciple may well be admitted where, in the transaction under consideration, the agent on his own part deals with his principal or with another agent. · In such a transaction he ceases to be an agent *pro hac vice,* and he can not be required to make disclosures beyond those required of any adverse party to a negotiation. *Bank of Overton* v. *Thompson,* 118 Fed. Rep. 800; 5 Cyc. 462 and cases cited.

In *Innerarity* v. *Merchants' Bank,* 139 Mass. 332, a case which carries the doctrine as far as any which is cited by the claimant, one of the directors of the defendant bank obtained a fraudulent loan from the bank, and it was held that his knowledge of the fraud was not imputable to the bank. But in this case, as in others of the same character, it is evident that the other members of the board were the agents of the bank, while the fraudulent director occupied an adverse relation to it.

In *Bank of U. S.* v. *Davis,* 2 Hill, 451, where a director acted alone on behalf of the bank in discounting paper, the avails of which he appropriated, the bank was held liable. And we think we may say, as argued by the counsel for the receivers, that this exception does not prevail when the transaction on behalf of the corporation is intrusted to the agent alone.

The cases cited by the master fully sustain this conclusion.

In *Bank of New Milford* v. *Town of New Milford,* 36 Conn. 93, Conklin, as cashier of the bank, discounted a note which he made without authority as treasurer of the town. Suit was brought by the bank against the town, and there, as here, it was argued for the claimant that the note was in proper form, that the money was paid into the treasury of the town when it came to the hands of the treasurer, and the misappropriation was an act which the bank was not concerned about. The court, however, doubted whether the whole transaction represented any valid contract, as the active agent for both parties intended it merely as a subterfuge, expecting to take up the note without recourse to the maker (as Dresser did the drafts in the case at bar); but held that if there was a contract of loan the knowledge of its fraudulent nature was imputable to the bank. This case differs from ours only in

that other officers of the town were not confederates in the fraud of the treasurer, as Caldwell and Thurlow were here.

In *First Nat. Bank* v. *Blake*, 60 Fed. Rep. 78, Cornish held a promissory note as a pledge to be redelivered upon a certain contingency. He was president and general manager of the plaintiff bank, and as such discounted the note for himself. The court held that the knowledge of the condition was imputable to the bank, and in accordance therewith the bank was ordered to surrender it the note. The court, after recognizing the cogency of the exception, say: "But there is no room for the application of this principle where the agent is the sole representative of both parties in the transaction. If Cornish was the sole representative of the bank in the transaction with himself, there was no one from whom information could have been concealed or to whom it could have been communicated. If he was the sole representative of each party, each must have had equal knowledge. As the representative of the bank, his knowledge was not affected by his private interests, however much his conduct may have been. He necessarily knew as much in one capacity as he did in the other. The bank is charged with the knowledge which Cornish had," citing *Holden* v. *Bank*, 72 N. Y. 286; *National Security Bank* v. *Cushman*, 121 Mass. 490; *First Nat. Bank* v. *Town of New Milford*, 36 Conn. 93; *Loring* v. *Brodie*, 134 Mass. 453; *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268, 17 N. E. 496; *Waynesville Bank* v. *Irons*, 8 Fed. 1; *Traders National Bank* v. *Smith* (Tex. Civ. App.), 22 S. W. 1056.

In *Brobston* v. *Penniman*, 97 Ga. 527, two members of co-partnership, who were respectively president and cashier of the claimant bank, made a firm note for their own benefit and discounted it on behalf of the bank. The court in the strongest terms held the bank chargeable with the knowledge possessed by its officers. This case was approved in *Morris* v. *Banking Co.*, 109 Ga. 12, where is was decided: "Where an individual has an interest in a promissory note which he knows was given without consideration, and such individual as cashier of a bank, having full authority and control of the discounts of the bank without reference to or consultation with any other

officer of the bank, discounts such note with the funds of the bank, the latter is not a *bona fide* purchaser of the note, without notice. If it ratifies the act of its officer and claims title to the note, it must take it subject to the knowledge which the officer who discounted it had at the time."

The still later case *Fouche* v. *Merchants National Bank*, 110 Ga. 827, adheres to the same doctrine.

In *Citizens' Savings Bank* v. *Walden*, 52 S. W. Rep. 953, the Court of Appeals of Kentucky held that where the plaintiff's cashier discounted notes held by a corporation of which he was a director, which notes had been procured by his fraud, the bank was held to have notice of the infirmities in the paper.

In *Traders' National Bank* v. *Smith*, 22 S. W. Rep. 1056 (Tex.), the official whose knowledge was imputed to the bank was also stockholder and director in a corporation from which the bank, through the president, purchased the note. The opinion upholds the notice on the ground that the interests of the officer were balanced. The case seems to us hardly important here, but incidentally it supports the general principle of the other cases cited.

We are constrained to hold with these cases upon grounds of public policy which requires that a corporation shall be held responsible for the knowledge which is possessed by those whom it appoints to represent it. From the nature of its constitution it can have no other knowledge than that of its officers, and in dealing with such officers, as with the corporation itself, third parties have a right to consider that what they know it knows.

Indeed, when the presiding officer of a corporation is intrusted with the transaction of its business, with full power to bind the corporation in respect to such business, it seems more proper to call the knowledge which he has actual knowledge of the corporation rather than to say it is imputed.

The claimant's counsel does not appear to dispute this view of the law, but founds his defence on this point upon the statement that Dresser did not act alone in directing the discount of these drafts. The contrary, however, is conclusively shown by the evidence adduced by the master, which we have quoted above.

We conclude, therefore, that the claim of the Commonwealth Trust Company was properly rejected.

The several objections to the introduction ·of evidence taken at the hearing are in our opinion unfounded and must be overruled.

It is hardly necessary to add that, with respect to the two drafts which were not protested, failure to give notice of dishonor released the makers and endorsers under the rule which is now well established. Daniel Neg. Inst. 5th ed. §§ 1171, 1172, and cases cited.

The exceptions to the master's report taken by the Commonwealth Trust Company are overruled.

A decree will be entered by the Superior Court in accordance with this opinion, and counsel will forthwith present to this court a draft decree for its approval.

*Comstock & Canning, and Gardner, Pirce & Thornley,* for receivers.

*John G. Milburn, Edwards & Angell, and John A. Tillinghast,* for claimants in the first class.

*Justus P. Sheffield and Burbank & Brown,* for Manufacturers Commercial Company.

*Charles A. Wilson and Atwater & Cruikshank,* for Commonwealth Trust Co.

*Richard E. Lyman and Cardoza & Nathan,* for American Exchange National Bank.

*Robert D. Murray,* for certain creditors.