𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫

Meem, Haskins & Mitchell v. Big Ax Pocahontas
Coal Company.

September 9, 1915.

1.  Corporations—*Contract Made by Officer—Case at Bar.*—The offi-
cers and stockholders of a mining corporation consisted of
three persons who, respectively, held the offices of president,
secretary, and treasurer, and were the only directors of the
company.  The secretary and treasurer owned four-fifths of
the stock and the president the remaining one-fifth.  The sec-
retary, with the knowledge and approval of the treasurer,
employed engineers to lay off the property of the company
into mining sections or leaseholds, and to locate a railroad.
He conducted the entire correspondence for the company and
made the contract in its name.  He managed the business
throughout, personally visited the property and directed the
course of the work.  The treasurer made several payments on
account of the work, and the circumstances strongly tend to
show that the president had knowledge of and consented to
the work being done, though he denied it, and no formal action
on the subject was taken by the board of directors, as such.
The company refused to pay the engineers for their services,
and they instituted this action.

*Held:* The contract was within the charter powers of the com-
pany, and it is liable upon the contract made by its secretary
under the circumstances aforesaid.  It is estopped from rely-
ing upon any irregularity in making the contract.

Appeal from a decree of the Circuit Court of Buchanan
county.  Decree for the defendant.  Complainants appeal.

*Reversed.*

The opinion states the case.

*L. J. Holland* and *J. Powell Royall,* for the appellants.

E. Withers, Flanagan & Boyd and Williams & Combs, for the appellee.

Whittle, J., delivered the opinion of the court.

This is an attachment in equity brought by appellants, Meem, Haskins & Mitchell, a firm of civil and mining engineers with offices at Bluefield, W. Va., to recover from appellee, the Big Ax Pocahontas Coal Company, a non-resident corporation with offices in Chicago, Illinois, $2,841.77 for certain surveying done by them for the corporation.  From a decree of the circuit court denying plaintiffs' demand this appeal was allowed.  The parties will hereinafter be referred to as plaintiffs and defendant.

In November, 1910, the defendant acquired by purchase 17,560 acres of land situated in Buchanan county, Virginia. At the time of the transactions under investigation the officers and stockholders of the defendant consisted of Thomas H. Watson, president and director, Clarence A. Tuttle, treasurer and director, and P. D. Whitehead, secretary and director, all of whom are non-residents of Virginia.  There were also one or two other nominal stockholders to make up the number of persons required to obtain the charter; but Watson, Tuttle and Whitehead constituted the officers and governing body and owned all the stock.  In addition to the 17,560 acres owned by the defendant, the evidence and circumstances show that it was interested in an adjacent tract of 18,000 acres of coal land known as the "Fairmont-Buchanan" property, and likewise in the ultimate construction of a branch line of railroad to connect those properties with the C. C. & O. Railway.

In the spring of 1912 Whitehead opened correspondence with plaintiffs looking to their employment on behalf of the defendant to do certain preliminary surveying on the two properties referred to and the line of the proposed rail-

road. The correspondence was conducted from the Chicago office by the defendant's secretary and continued throughout the year. By letter dated June 3, 1912, plaintiffs were definitely employed to do the surveying and directed to lay off both properties in sections. On June 17, 1912, the defendant wrote as follows: "You do not need to pay any attention to any tracts, only to the two tracts as a whole . . . I recommend that you commence at the mouth of Dismal creek, survey a tract of two thousand acres—one thousand—three thousand—two thousand—three thousand and one thousand; . . . these are the leases that are signed and must be located on the 'Fairmont-Buchanan' tract. We have surface rights for mining purposes on the entire 45,000 acres. We do not care to put an additional crew on at present. I will probably be down before long, will send you check this week for last month's work.

"Yours truly,
"BIG AX POCAHONTAS COAL CO.,
"P. D. Whitehead, Secretary."

In the defendant's letter of September 6, 1912, it says: "Have just wired you as follows: 'Communicate immediately with Mitchell (one of the plaintiffs), instruct him to make railroad survey indicated in his letter August 24, namely, leave C. C. and O. mouth of McClure Fork of Russell, up Prater Fork of Russell to tunnel, down Prater Fork to Levisa river to mouth of Dismal. Put on entire corps and rush the work, letter following.' This letter confirms the above instructions. I have sent a copy of this letter to Mr. Mitchell at Marvin. Mr. Mitchell understands that he is to keep this business as quiet as possible and to avoid any excitement among the natives. . . . "

Whitehead, as secretary, assumed full authority to represent the defendant with respect to this surveying, and the subject-matter was not only within the charter powers of the corporation but the work he was having done was

usual and necessary in the primary stages of a mining enterprise and was apparently within the scope and line of his official duties. At all events, plaintiffs in good faith entered into the contract and incurred the expenses and rendered the services set out in the itemized account filed with their bill. In addition to the correspondence, Whitehead visited the property and held personal interviews with plaintiffs touching the character and progress of the work, and during its continuance there was no suggestion from any source questioning the authority of the secretary to make the contract or the liability of the defendant to pay for services rendered. To the contrary Clarence A. Tuttle, treasurer, recognized the binding effect of the contract and made the following payments to plaintiffs on account, viz: July 20th, $68.00; August 10th, $171.60, and September 11th, $487.42. The treasurer, it is true, made these payments with personal checks; but it must be remembered that the company at that time had only reached the formative period; it had not commenced to operate, and had no source of revenue or funds in the treasury. That, no doubt, explains the action of the treasurer in discharging the defendant's obligations with his individual checks, as, in like manner, on July 1, 1912, he gave his own check for $30,000 in payment of one of the purchase money notes for the land. Thomas H. Watson, president, denies that he knew of this contract until December, 1912, when suit was threatened unless plaintiffs' bill was paid. He also denies that the board of directors in meeting ordered the work to be done, or authorized the secretary to contract for it. Nevertheless, the president admits that the necessity for laying off the defendant's property in mining sections or leaseholds and of building a railroad to its holdings had often been discussed, but says that no action had ever been taken by the board. He likewise admits that he knew of Whitehead's visits to the property, but denies

that he was advised of their object. There was apparently no motive for the secretary and treasurer to have withheld from the president information concerning the employment of the corps of engineers to do the necessary surveying to develop the corporate property. Such conduct on their part would have been against experience and is inexplicable. The president must have been strongly indifferent to the defendant's affairs so long to have remained in ignorance of the correspondence between its secretary and the plaintiffs. In such case, where the interests of third parties are involved, the policy of the law forbids that the chief officer of the corporation shall close his eyes to obvious occurrences and be heard to complain that he does not see. It has been said by this court that "indolent ignorance and indifference will no more avail than will voluntary ignorance of. one's rights." *Redford* v. *Clark,* 100 Va. 123, 40 S. E. 630.

In *Winston* v. *Gordon,* 115 Va. 899, 80 S. E. 756, it was held: "An act of an agent from which he derives no personal benefit, but which is done in good faith for the benefit of his principal, and which was apparently necessary and would redound to his benefit, will be held to have been ratified and acquiesced in, and thereby rendered valid upon slight evidence." And it is said, "this doctrine is as applicable to corporations as to other principals."

. So also in *Peters* v. *Waverly Co.,* 113 Va. 318, 74 S. E. 168, it was said, that the action of the board of directors in excess of their authority but within the charter powers could be ratified by a majority of the stockholders.

The effect of knowledge of officers and agents on the corporation is discussed in *Atlantic Trust Co.* v. *Union Trust Co.,* 111 Va. 574, 69 S. E. 975. The case of *Cook* v. *Am. Tubing Co.,* 28 R. I. 41, 65 Atl. 641, 9 L. R. A. (N. S.) 212, (where the authorities are reviewed), cited in the opinion, will be found instructive. The contract in the

present case was within the charter powers of the corporation and was made with the knowledge and consent of a majority of both the stockholders and board of directors; and as the circumstances strongly tend to show, of the president as well, who owned the rest of the stock and was the only other director.

The remarks of Holt, Judge, in *Am. B. H. O. S. Mach. Co.* v. *Burlock*, 35 W. Va. 647, at p. 661, 14 S. E. 319, at p. 323, are pertinent to the defenses here relied on: "There are so-called corporations which for all practical purposes, when they do business, cannot be reached at all if we are not permitted to treat the only known or accessible embodiment in any other way than according to the character the manager may see fit for the occasion to assume. He is possessed of full authority to talk and act when there is anything to be gained, but he is not the proper man to talk or act when there is anything to be lost; and yet the principal, for all practical purposes, if not often in reality, is represented in no other way except by a name, so that a species of legerdemain is carried on, 'Now you see it, and now you don't.' The ordinary business world is becoming tired with, if not vexed at, this sort of jugglery, and thinks that the true principles of evidence and of agency are not so narrow or so rigid that they may not be made to reach such cases."

The defenses here relied on are not substantial. As remarked, the contract was within the charter powers of the corporation, and apparently within the scope of the secretary's authority. He conducted the entire correspondence from the defendant's office in Chicago, and made the contract in its name. He managed the business throughout, and personally visited the property, and directed the course of the work. All this, too, was done with the knowledge and approval of the treasurer, the auditing and financial officer of the corporation, who made payments to

the plaintiffs in pursuance of the contract. Besides, these two officers constituted a majority of the board of directors and owned four-fifths of the capital stock.

In these circumstances, though the making of the contract in its inception may have been irregular, it was not a void act. It was done by the procurement of officers and stockholders, who possessed full power to have made the contract as an original proposition, and the defendant received the benefits. By their conduct those constituting the governing body of the corporation will be held to have waived such irregularity, and the defendant is estopped to rely on it as a defense.

For these reasons the decree must be reversed, and the case remanded for further proceedings not in conflict with the opinion of this court.

*Reversed.*